Filed 6/15/26  P. v. Perez CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E086153 |
| v. | (Super.Ct.No. RIF2004322) |
| JUAN MANUEL PEREZ, JR., | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Jason Armand, Judge.

Affirmed.

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In this *Anders/Wende* matter,[1] defendant and appellant Juan Manuel Perez, Jr., appeals from the trial court's entry of judgment following a jury verdict convicting him of second degree murder for slaying Dominic Santos, with a penalty enhancement for personal use of a knife as a deadly weapon. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1)); all further undesignated statutory references are to the Penal Code.) At sentencing, the trial court imposed an indeterminate term of 15 years to life for the murder, plus a year for the weapon enhancement.

On appeal, our independent review of the record and the law discloses no issues of arguable merit on which to request briefing by the parties. (See *People v. Johnson* (1981) 123 Cal.App.3d 106, 109 ["an arguable issue" requires "a reasonable potential for success" on appeal].) We therefore affirm the judgment.

## BACKGROUND

Just before midnight on December 14, 2020, law enforcement and paramedics responded to a 911 call that a nonresponsive male body lay in the street near a Taco Bell restaurant on University Avenue in Riverside. The man, later identified as Santos, was already deceased. In examining the body for signs of life, a paramedic observed contusions on the decedent's mouth and, upon opening the man's clothing, discovered a

---

[1] *Anders v. California* (1967) 386 U.S. 738; *People v. Wende* (1979) 25 Cal.3d 436.

2

"penetrating" chest injury, near the decedent's heart.[2]  Police investigators discovered a live bullet among other items in Santos's pants pockets, but no wallet or cell phone.

An officer who responded to the scene contacted the restaurant employee who called 911 about the body lying in the street.  The employee initially assumed the man on the ground was intoxicated and passed out, or possibly homeless.  She did not recall hearing any screams, gunshots, or other alarming noises before spotting the body.  She informed the officer, however, that a regular drive-thru customer named "Mario" shared with her on the Snapchat app platform a video of a confrontation involving the man in the street before he died.

The responding officer viewed the Snapchat video on the employee's phone and investigators several months later were able to locate Mario Baca, the "Mario" who recorded and shared the video.  Baca testified at trial about what he saw and recorded, and didn't record, that evening, as we summarize further below.  The video was played for the jury at trial, with transcripts of the audio that was discernible provided to the jury.

Meanwhile, law enforcement's investigation in the immediate wake of the killing included review of the Snapchat video, which the officer had the employee record for him.  The recording showed that a white car depicted in the video, a Toyota or Hyundai sedan, had a front left wheel that stood out because it was black while the rest of the

---

[2]  An autopsy later confirmed Santos's death was caused by a stab wound to the left side of his chest, inflicted by a single-edged knife.  The knife wound penetrated through the heart, leading to Santos's incapacitation within minutes and his death from internal bleeding.

3

wheels were chrome.  It also lacked a front license plate.  The video was also the source of the description law enforcement used to try to locate the decedent's assailant:  a thin-built, taller Hispanic male around 20-25 years old, wearing green pants and dark-colored shoes with white laces and soles.  The assailant also wore a black hat and a black hooded sweatshirt.

By around mid-day or so after the killing, police investigators were able to develop leads regarding a cell phone number that may have belonged to the victim.  Forensic technology to "ping" the phone's location led law enforcement to an apartment complex on Central Avenue.  There, a resident noticed the officers onsite and turned in the victim's cell phone, which her husband had found ringing near a stairwell very early that morning.

About 30 yards from the stairwell, the officers noticed the white Hyundai they were seeking.  It was backed into a parking spot and occupied by a woman, later identified as Mary Madrid, defendant's girlfriend.  A red SUV was parked in front of Madrid's vehicle, blocking it into the parking spot.  Defendant stood outside Madrid's driver's side window.  As the police approached, defendant said, "I already know.  I fucked up.  Trust me."  Defendant matched the suspect's description from the Snapchat video, including his green pants and his shoes.

Red droplets that appeared to be blood stained the front of defendant's pants.  There were also red droplets on the driver's side door of the white vehicle.  Defendant had a cut on the top of his right hand and some droplets or stains on his hand that a

4

responding officer said resembled blood. Madrid told the officers she was afraid of defendant. Both were transported to the police station, where Madrid was later released.

A detective confronted defendant with the Snapchat video while interviewing him. Including by stating: "So watch this part. You kick him. Stab him. That's probably why you got blood on your pants right now." Defendant denied he was in the area near the Taco Bell that night, and denied he was involved in a fight. He denied he was depicted in the video ("that's not even me") and claimed that the droplets were "paint. It's all paint." When the detective responded with incredulity in light of defendant's clothing ("I mean those are those shoes. Those are the pants, right? I mean I showed you, right man?), defendant maintained his denial. Defendant pointed to the popularity of the shoe brand and disputed whether "those are really Jordans" in the video.

Defendant also claimed in the interview that the pants and shoes were not his, he had only been "just borrowing them" as of that evening. He changed into them late that night, when he saw his cousin passing by on a bicycle. Defendant explained: "He just passed by quick on the bike, you know, the only reason he stopped is cuz I wanted the shoes." He added that because he was homeless, "I don't have clothes like that, you know so if my homie has some pants for me, I'm gonna take them." Defendant insisted, "I'm gonna give them back, hopefully."

Defendant also explained that the cut on his hand and the blood on the car door resulted from punching his girlfriend's vehicle window, which was "really why I thought the cops pulled up."

5

It emerged early in defendant's police interview that Madrid borrowed the white car from her cousin, "Carla." Investigators who examined the vehicle had learned that it was registered to Carla Robles. The investigation had also yielded the decedent's identity and that, according to his probation records, he shared an address with Robles.

Additionally, two folding knives and an unregistered firearm were recovered from the white Hyundai. Latex gloves were also found near the center console inside the vehicle. DNA testing on swabbed samples from the handgun strongly suggested defendant as a contributor, with "moderate" support for decedent as a contributor, according to a DNA expert who testified at trial. Knife blade and handle DNA samples could not be attributed to any known contributor. DNA samples recovered from the white Hyundai door and defendant's pants matched defendant's DNA profile, but excluded the decedent's. A DNA sample from the decedent's cell phone excluded defendant as a contributor.

Other evidence at trial included surveillance footage from a business on University Avenue that depicted a white Hyundai Sonata, with a black-painted front driver's side rim, traveling southbound towards University Avenue, and then eastbound on University Avenue around 11:38 p.m. on the evening Santos was killed. The same vehicle was seen on additional surveillance footage in the area 18 minutes later, just before midnight. Other forensic evidence at trial indicated that call logs on Madrid's cell phone showed a call between that phone and defendant's phone at 11:20 p.m., an unanswered call at

6

12:48 a.m., and another connected call at 12:53 a.m. No data could be recovered from decedent's phone due to it being locked with an unknown PIN.

Robles testified at trial. She disclosed that the day Santos was killed, she and Madrid had spent the day with Santos and defendant, including driving around in her (Robles's) car. They spent time "hanging out" near University Avenue in Riverside. Robles had known Santos for about a year before his death; they had been intimate briefly, remained friends, and she allowed him to use her residence as his probation address. She had been an illegal drug user at the time but was now sober. Madrid had also known Santos for a couple months, and, through Madrid, Robles knew defendant. On the day they had been driving around together, Robles recalled seeing a handgun in the car, which she understood Madrid had obtained from Santos. Madrid had been "looking for a gun" and had contacted Robles "for help to get one." Robles did not at any time see anyone waving the gun or acting violently with it.

Robles testified that in the evening, as it was getting dark, she took a rideshare home to be with her daughter, but she left her vehicle with Madrid, which was not uncommon between them, since they were "family." Robles confirmed before departing that Madrid was comfortable with Santos remaining with her and defendant. Robles went home and went to bed.

Robles testified that when the police later contacted her, they showed her the Snapchat video, and she recognized defendant and Santos in the video based on their

7

clothing and height. In particular, she recognized the green pants that defendant had been wearing that evening.

Baca, who had originally recorded the Snapchat video, testified at trial. When he was exiting the Taco Bell drive-thru, but before he started recording, Baca noticed two people get out of a white car "arguing at first and then it led to fighting" by "the side of the street." Baca "pulled out [his] phone, started recording, seeing both of them fighting each other. Looked like one was fighting and the other person was backing up while trying to defend himself." Baca summarized the "altercation" as a whole as beginning with the men exiting the car, "trying to fight," then "the person in gray tripped, the guy in the black threw punches at him when he was on the [ground], hit him a couple of times." Then "the one in gray stood back up. After that, looked like the gray walked towards the black. The black threw a punch." Baca described this striking, "knockout" blow as towards the "upper body," in the "[c]hest area" or "above," and then the man in gray "fell."

Baca clarified that he recorded the video in two clips, with a short gap of five to 10 seconds between the recordings. (He earlier estimated for the defense investigator before trial that the gap was as long as 20 seconds.) Baca testified that during "[t]he portion not recorded I saw the person in the black throw a punch towards the person in the gray. The person in the gray fell." Then Baca started recording again. Baca recalled that there was something about the individual in black's movement that made him think the man in gray might have been trying to grab something from the man in black, although he was not

8

sure.  Baca described what he termed the "knockout" of the person in gray, sending him to the ground, as the "main highlight" of what he saw, and said he was disappointed it was not recorded.  Baca saw the man in gray, after he stood up, "walking towards" the other person, but Baca did not see the man in gray "do anything aggressive" before the final punch.

Baca did not hear any gunshots, did not hear anyone yell "gun" or otherwise scream anything during the fight.  After the man in gray fell to the ground the final time, Baca saw the man in black "walking back towards [him] to grab stuff out of his pockets." Baca saw the man in black remove things from the other man's pockets but did not know what they were.  Baca heard the woman in the white car screaming at the man in black to get into the vehicle.  The man did so and they drove off.

In closing arguments, the prosecutor and defense counsel argued for and against whether defendant was depicted in the Snapchat video and debated defendant's credibility.  The jury convicted defendant as noted above, and he appealed.

## APPEAL AND REVIEW

Defendant received appointed counsel on appeal.  Counsel's review of the record and legal research uncovered no arguable issues to raise on appeal, including after consultation with Appellate Defenders, Inc.  In reaching that conclusion, counsel noted for our potential consideration in our independent review numerous issues she had researched and rejected as arguable issues.

9

Those issues included whether the trial court erred and, if so, was there any prejudice in: (1) excluding evidence that defendant's girlfriend, who did not testify, wanted to obtain a firearm to have someone unrelated to this case killed; (2) admitting autopsy photos of the victim; (3) admitting defendant's police interview, citing, e.g., *Miranda v. Arizona* (1966) 384 U.S. 436; and (4) denying for lack of evidence the defense jury instruction request to include bracketed language in CALCRIM self-defense instructions Nos. 505 and 571, regarding how to proceed if the jury found the victim Santos previously threatened defendant. Other issues that appellate counsel suggested in *Wende* briefing for our potential independent review included: (5) the sufficiency of the evidence to support the jury's murder verdict; (6) whether the court engaged in an improper, prejudicial dual use of facts to find an aggravating factor true and to impose the knife-use weapon enhancement; and (7) whether defendant unequivocally invoked during his police interview his right to an attorney.

We gave defendant the opportunity to file a personal supplemental brief, and he has not done so. Having independently reviewed the record for potential error, we are satisfied defendant's attorney has fully complied with the responsibilities of counsel and no issue of arguable merit on appeal exists. (*People v. Kelly* (2006) 40 Cal.4th 106, 126; *Wende*, *supra*, 25 Cal.3d at pp. 441-442.)

10

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

LEE _____

J.

We concur:


CODRINGTON _____

Acting P. J.


RAPHAEL _____

J.